Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1316 | **DATE** | 11/9/2000 |
| **CASE TITLE** | Ray Zakaras vs. United Airlines | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Summary Judgment (33-1) is granted in part. Defendant's Motion for Summary Judgment is granted on the *quid pro quo* sexual harassment, retaliation, age discrimination and breach of contract claims. Defendant's Summary Judgment Motion on Count IV, perceived disability discrimination in violation of the ADA, is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | NOV 1 3 2000 | | |
| | Notified counsel by telephone. | | | date docketed | | 54 |
| | Docketing to mail notices. | | | IS | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 11/9/2000 | | |
| | | | | date mailed notice | | |

ED-7
FILED FOR DOCKETING
00 NOV -9 PM 3: 45

VKD
courtroom deputy's initials

Date/time received in central Clerk's Office

VKD
mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



RAY ZAKARAS,

      Plaintiff,

      v.

UNITED AIRLINES, INC.,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 98 C 1316

Magistrate Judge
Arlander Keys

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Ray Zakaras has sued Defendant United Airlines, Inc. ("United") for *quid pro quo* sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e *et seq.* (West 2000), age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.* (West 2000), and perceived disability discrimination under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.* (West 2000). Additionally, Mr. Zakaras has sued for breach of contract under Illinois common law. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment on



the *quid pro quo* sexual harassment, retaliation, age discrimination and breach of contract claims, but denies Defendant's Motion for Summary Judgment for perceived disability discrimination.

## FACTS

This controversy arises out of United's demotion of Mr. Zakaras, occurring sometime in October/November 1996,[1] from his management position of twenty-three years as a Ramp Supervisor at O'Hare International Airport to a non-management position in Air Freight. Defendant contends that this demotion from a supervisory position to a non-supervisory position, with a consequent 30% reduction in pay, stemmed from Mr. Zakaras' inappropriate conduct at United's Cultural Leadership Training ("CLT") program held from August 19 to August 22, 1996 at the Hickory Ridge hotel. Plaintiff maintains, however, that United subjected him to *quid pro quo* sexual harassment by making him participate in two "exercises" at the leadership conference, retaliated against him for complaining about sexual harassment, and discriminated against him based on his age and perceived disability of alcoholism. Plaintiff also contends that United violated its sexual harassment policy and its

---

[1]     As will be explained *supra*, whether the demotion occurred on October 25th or in mid-November is one of the disputed facts in this case.

Employee Assistance Program ("EAP") when it demoted him.

## I.  Background on Mr. Zakaras

Mr. Zakaras began working for United in 1964 as a Ramp Serviceman in the O'Hare Ramp Services Department. In 1966, he took a miliary leave of absence for the Vietnam War, and in 1969, after receiving an Honorable Discharge, returned to his position at United. In 1971, United upgraded him to a Cargo Operations Planner Position, and in 1973, United promoted him to a management position, Ramp Services Supervisor, in the Ramp Services Department at O'Hare. (Plaintiff's Statement of Material Facts ["Pl.'s SMF"] ¶ 1.) Mr. Zakaras remained in this management position until his demotion, which is the subject of the present controversy.

It is undisputed that, in Mr. Zakaras' thirty-six years of employment with United, he has never consumed any alcohol at work, has never been under the influence of alcohol at work, and has never been intoxicated off the job while in uniform or while on company property. (Pl.'s SMF ¶ 3.) Furthermore, prior to his demotion, he had never been disciplined in all the years that he worked for United. (Pl.'s SMF ¶ 4.) Additionally, Mr. Zakaras never received any criticism from anyone regarding how he supervised employees who reported to him. (Pl.'s SMF ¶ 11.)

## II.  The CLT Conference

From August 19 to August 22, 1996, Mr. Zakaras and a group of over seventy United employees attended United's CLT program at the Hickory Ridge Conference Center.  CLT was designed to teach supervisory-level employees how to effectively implement changes in United's corporate culture.  (Defendant's Statement of Uncontested Facts ["Def.'s SUF"] ¶ 9.)

As an attendee at the conference, Mr. Zakaras found parts of CLT objectionable, and in violation of United's policies against sexual harassment and discrimination.  (Pl.'s SMF ¶ 44.)  First, Mr. Zakaras contends that the "web" and "patio block" exercises at CLT were sexually offensive and violated United's sexual harassment/zero touching policy.  (Plaintiff's Response to Defendant's Statement of Uncontested Facts ["Response to Def.'s SUF"] ¶¶ 9-10.)  In the "web" exercise, each group lifted and passed an employee through a web of ropes without touching the ropes, and in the "patio block" exercise, each group stood together on a series of blocks for a short period of time.  (Def.'s SUF ¶ 10; Pl.'s SMF ¶ 41.)  Mr. Zakaras maintains that it was necessary to touch the buttocks of individuals during the "web" exercise, and that the "patio block" exercise involved bodily contact against employees' genitals and breasts.  (Pl.'s SMF ¶ 41.)  United

-4-

contends, however, that it was not necessary to touch the buttocks, breasts, genitals, or any private parts of employees during any CLT exercise. (Defendant's Response to Plaintiff's Statement of Material Facts ["Response to Pl.'s SMF"] ¶ 41.)

In addition to these exercises, Mr. Zakaras found certain remarks by Gerald Greenwald, United's Chief Executive Officer in 1996, disturbing. At CLT, Mr. Greenwald spoke to the CLT attendees at dinner about changes in United's corporate culture, and according to Mr. Zakaras, made anti-ageist comments during his speech. (Pl.'s SMF ¶ 48.) Specifically, Mr. Zakaras contends that Mr. Greenwald singled out older management employees by stating, "you older guys will be gone from this company by next March . . . especially you older guys . . . you're not going to be here." (Pl.'s SMF ¶ 48.) United denies that Mr. Greenwald made any negative remarks about older employees at CLT. (Response to Pl.'s SMF ¶ 48.)

As a result of the two exercises and Mr. Greenwald's comments, Mr. Zakaras informed Dick Allen, his CLT supervisor and CLT Team Facilitator, and Lynda Martin, the United employee in charge of CLT, that the "web" and "patio block" exercises, in his opinion, violated United's sexual harassment policy. (Pl.'s SMF ¶ 58.) Mr. Zakaras also told Mr. Allen that Mr. Greenwald's comments

were offensive, and likely in violation of United's anti-discrimination policy. (Pl.'s SMF ¶ 58.) According to Mr. Zakaras, Mr. Allen and Ms. Martin informed him that his objections were valid, and that the CLT facilitators would review them at their next meeting. (Pl.'s SMF ¶ 58.) Mr. Zakaras maintains, however, that no investigation was ever done, and worse, United, eventually, retaliated against him for expressing his concerns.

It is undisputed that United served and paid for alcoholic beverages during the CLT conference. (Pl.'s SMF ¶ 46.) Mr. Zakaras admits that on the night in question[2], he consumed three or four beers at dinner, and then six or seven more in the Arbor Bar at Hickory Ridge following dinner. (Def.'s SUF ¶¶ 13-15.) Mr. Zakaras explains, however, that the last six or seven beers consumed by him occurred *after* the CLT conference concluded for the day, where employees were free to do what they wanted in their private time.[3] Mr. Zakaras further maintains that many United

---

[2]    Neither Plaintiff nor Defendant state what date the events at the bar occurred. Instead, both parties refer to one evening between August 19-22, 1996 at the CLT conference. (Pl.'s SMF ¶ 13.)

[3]    United contends that Mr. Zakaras was not free to do as he wished at the conclusion of the conference for the day. Rather, he needed to act in compliance with United's Code of Conduct. (Response to Pl.'s SMF ¶¶ 45, 51.)

employees were intoxicated at the bar that evening, and moreover, that United knew that many of its employees tended to become inebriated at these conferences, but still continued to sponsor and pay for alcohol.[4] (Pl.'s SMF ¶¶ 47, 50-51.)

At the Arbor Bar that evening, Mr. Zakaras, admittedly, made some inappropriate comments to various female United employees. For instance, Mr. Zakaras told Pat Boquist, a female Customer Service Supervisor at United, that he had left the dinner at CLT early, and went to the bar, because he "didn't want to hear anything Greenwald had to say," and that he had "worked at the company for 30 years" and "wasn't about to change now." (Def.'s SUF ¶¶ 17-18.) Mr. Zakaras, then, repeatedly asked Ms. Boquist if she was "happily married", and at one point, put his hand on her leg. (Def.'s SUF ¶¶ 19-20.) Mr. Zakaras also asked Sharon

_____

[4] Indeed, Mr. Zakaras submitted the affidavit of Sheila Remer, CLT Logistics Coordinator, who claims that she was concerned about the level of alcohol consumption at United conferences, and that she had complained to Marlon Crawford, People Services Representative at United, that management employees were bringing coolers into the hotel and behaving as if the CLTs were a "party atmosphere." Ms. Remer further claims that she recommended, unsuccessfully, that United stop serving alcoholic beverages at these conferences. (Plaintiff's Evidentiary Materials ["Pl.'s Evid. Mat."] at Ex. 8, ¶¶ 9-11.) Lynda Martin, a CLT Facilitator, also admitted in her deposition that the CLT Facilitators had expressed concerns about CLT participants becoming intoxicated at the CLTs. (Martin's Dep. at 75-76.)

Burbank, another supervisor at United who was present at the Arbor Bar that evening, whether she was "happily married," and at one point, commented about how nice the ass was of one of the female CLT participants. (Def.'s SUF ¶¶ 22-23.)

## III. The Investigation

When David Schneider,[5] Mr. Zakaras' immediate supervisor and Manager of United's Ramp Services Department, learned of Mr. Zakaras' conduct at CLT, he began an investigation and received written statements from Ms. Boquist, Ms. Burbank, and Ms. McNeill (another United employee who was at the Arbor Bar that evening).[6] (Def.'s SUF ¶ 25.) In Ms. McNeil's statement, she said that she had not felt threatened by Mr. Zakaras' behavior. (Pl.'s Evid. Mat. at Ex. 9.) Moreover, Ms. Boquist wrote that, while Mr. Zakaras at one point had touched her leg, she attributed the touching to a

---

[5]     Mr. Schneider became Manager of the Ramp Services Department in early or mid 1994. On or about 1994, Mr. Zakaras began to report directly to Mr. Schneider. (Pl.'s SMF ¶ 10.) Until the present controversy, Mr. Schneider had always rated Mr. Zakaras' work performance as "good or acceptable," was not aware of any reprimands or criticism that Mr. Zakaras had ever received, and could not recall any work rule violation or inappropriate conduct by Mr. Zakaras. (Pl.'s SMF ¶¶ 12,14; Schneider's Dep. at 223.)

[6]     Mr. Schneider never personally spoke to these three women, but instead relied on their written statements. (Schneider's Dep. at 67-68.)

"drunken movement" and not a sexual advance. (Pl.'s Evid. Mat. at Ex. 10.) Ms. Burbank wrote that it was difficult to even hear what Mr. Zakaras was saying because of the noise and music in the bar. (Pl.'s Evid. Mat. at Ex. 12.) Mr. Schneider testified that he had no reason to disbelieve the women's statements. (Schneider's Dep. at 129-131, 133.)

On September 20, 1996, Mr. Schneider met with Mr. Zakaras and asked him to address four issues in writing: (1) whether he touched someone's leg at the bar; (2) whether he asked females harassing questions; (3) whether he walked out on Mr. Greenwald's speech; and (4) whether he engaged in inappropriate behavior by drinking in excess at CLT. (Def.'s SUF ¶ 26.) Mr. Schneider informed Mr. Zakaras that he was to bring his written statement, answering these questions, to another meeting on September 25, 1996.[7] (Def.'s SUF ¶ 27; Pl.'s SMF ¶ 59.)

---

[7]     Mr. Zakaras contends that the meeting on September 20th with Mr. Schneider was supposed to be for a periodic review of his work performance, and that Mr. Schneider asked him, without any warning, to answer questions concerning his behavior at the Arbor Bar lounge at the CLT conference held between August 19-22, 1996. (Pl.'s SMF ¶¶ 59-60.) Mr. Zakaras further claims that he asked Mr. Schneider for more details regarding the allegations and their context, but Mr. Schneider refused to offer him any additional information, and instead just told him to bring a written response to the questions to a September 25th meeting. (Pl.'s SMF ¶ 59.)

On September 25th, Mr. Zakaras met with Mr. Schneider and Marlon Crawford, a People Services Representative at United, and turned in his written statement, which denied any improper behavior at CLT. (Def.'s SUF ¶ 29-30.) Mr. Zakaras wrote, "I should not be forced to accept the views of any other person, including Mr. Greenwald, if I do not agree with what is presented," and, "I believe that I can retain the right to free expression as to what impact the curriculum shall have on my professional career." (Def.'s SUF ¶ 28.) Mr. Zakaras also told Mr. Schneider and Mr. Crawford that he saw some merit to the CLT program, but objected to the manner in which it was being taught (Pl.'s SMF ¶ 88), and that he felt that certain "exercises" at CLT were inconsistent with United's sexual harassment policy, because they required the touching of females. (Def.'s SUF ¶ 32.) Mr. Zakaras further explained that he had momentarily left Mr. Greenwald's speech at CLT, because he had received a 911 page from his son who lived with him, complaining that his prearranged ride had not shown up. (Pl.'s SMF ¶¶ 49, 69.) Mr. Zakaras continued, however, that, under the circumstances, he did not have to leave CLT to pick up his son, and consequently, returned to the CLT speech without stopping at the hotel bar. (*Id.*) Mr. Zakaras also claims that, at this meeting, he was informed for the first time that United was investigating him

for sexual harassment.  (Pl.'s SMF ¶ 63.)

Mr. Zakaras characterizes the September 25th meeting as an "unannounced fact-finding investigation" where he was forced to answer personal questions not relating to his work performance.[8] (Pl.'s SMF ¶ 39.)  According to Mr. Zakaras, at the September 25th meeting, Mr. Crawford and Mr. Schneider asked him inappropriate questions, such as whether he had a drinking problem, how much alcohol he drank at night at home, and how often he drank.[9] (Pl.'s SMF ¶¶ 38, 76.)  Mr. Zakaras maintains that he did not voluntarily offer information about his personal drinking habits or any alleged "drinking problem."  Instead, he disclosed information about his personal drinking habits during non-work time only in response to

---

[8]     United asserts that it had no obligation to give Mr. Schneider advance warning that it was undertaking a fact-finding investigation concerning his unacceptable behavior at CLT. (Schneider's Dep. at 144.)  Mr. Zakaras attests, however, that as long as he can remember, United has always informed employees of the facts surrounding an alleged violation of a rule or policy, before the fact-finding investigation. (Pl.'s SMF ¶ 65.)  While Mr. Schneider admits that he "normally tells" employees in advance that there is going to be a fact-finding investigation, United does not require it.  (Schneider's Dep. at 144.)

[9]     Mr. Schneider states that he does not recall whether he asked Mr. Zakaras personal questions about his drinking habits, such as how much he drank at home in his private hours.  He does not deny that he asked such questions, however. (Schneider's Dep. at 156-57.)  He does deny that he asked Mr. Zakaras whether he was an alcoholic or had an alcohol abuse problem.  (Id.)

Mr. Crawford and Mr. Schneider's extremely personal questions about his private life. (Pl.'s SMF ¶¶ 39, 76.) Indeed, according to Mr. Zakaras, he felt compelled to answer their questions, admitting that in the evenings, during his private time, he was drinking more than at other times in his life, because of the stress of his ongoing divorce. (Pl.'s SMF ¶ 77.) Mr. Zakaras also testified that he turned in a second written statement, acknowledging that he had a drinking problem, because Mr. Schneider and Mr. Crawford's words and demeanor indicated that his first written statement was unacceptable. (Pl.'s SMF ¶ 79.) Furthermore, Mr. Zakaras contends that Mr. Schneider ordered him to go to United's EAP, and personally walked him to an EAP Representative to ensure compliance.[10] (Pl.'s SMF ¶ 38.)

United, in contrast, insists that Mr. Zakaras voluntarily brought up his drinking problem at the September 25th meeting, and that Mr. Schneider did not ask him personal questions about his drinking habits. (Response to Pl.'s SMF ¶ 77.) Furthermore, United contends that Mr. Zakaras voluntarily asked, and received permission, to withdraw his initial statement and submit a new one.

---

[10]     Mr. Zakaras actually met with Mr. Fox, an EAP Representative, a couple days later, because Mr. Fox was not in on September 25th. (Def.'s SUF ¶ 34.)

(Def.'s SUF ¶ 31.)  Accordingly, later that day, Mr. Zakaras gave Mr. Schneider a revised statement, in which he wrote that he could not recall some of his conduct at CLT because he was "drinking alcohol to extreme," that his excessive drinking was no excuse for his behavior, and that he felt that drinking was a problem with which he had to deal. (Def.'s SUF ¶¶ 35-36; Pl.'s Evid. Mat. at Ex. 16.)  Mr. Schneider also insists that he only believed that Mr. Zakaras had a drinking problem, because that was what Mr. Zakaras had told him in his second written statement. (Schneider's Dep. at 229.)  Finally, United denies that Mr. Schneider or Mr. Crawford ordered Mr. Zakaras to go to EAP, or walked him down to an EAP Representative.  (Response to Pl.'s SMF ¶¶ 78, 80.)

During the ensuing investigation of Mr. Zakaras' behavior, Diane Zombo, United Air Lines Director for People Services (also called Director of Human Resources), met with Mr. Crawford[11] and recommended that Mr. Zakaras not be removed from his Ramp Services management position, because the alleged infraction could be considered a one-time event, Mr. Zakaras had good evaluations,

---

[11]   Ms. Zombo was Mr. Crawford's immediate supervisor. (Crawford's Dep. at 10.)

there had not been any "alignment" discussion with Mr. Zakaras,[12] United had a problem with other O'Hare management personnel being intoxicated at conferences, and the alleged incident did not occur at work. (Pl.'s SMF ¶ 16; Crawford's Dep. at 183-90.) Ms. Zombo, instead, recommended that Mr. Zakaras either be given a stern warning and/or possible random drug testing.[13] (Crawford's Dep. at 190.)

On September 30, 1996, Mr. Crawford and Mr. Schneider met to discuss how to handle the situation concerning Mr. Zakaras'

_____

[12] United had "alignment" discussions with United managers who did not appear to be adhering to United's new corporate philosophy and culture. (Schneider's Dep. at 204.) According to Mr. Crawford, Ms. Zombo was concerned with whether an alignment discussion had been held with Mr. Zakaras before he was to be demoted. (Crawford's Dep. at 184-186.)

[13] United argues that Mr. Crawford gave Ms. Zombo a "really brief description" of the allegations against Mr. Zakaras, and that the issues Ms. Zombo told him (e.g., good evaluations, one-time incident) were merely her "concerns" that should be considered. (Response to Pl.'s SMF ¶ 16.) Despite United's characterization of the meeting between Ms. Zombo and Mr. Crawford, it is clear that Ms. Zombo recommended that Mr. Zakaras not be demoted because of the aforementioned concerns. At Mr. Crawford's deposition, he was asked, "So, is it fair to say that after you met with Diane Zombo in her office and discussed Mr. Zakaras' case, that she recommended against removing him from his management position?" Mr. Crawford responded, "Yes." (Crawford's Dep. at 189-190.) Furthermore, Mr. Schneider's' notes dated September 30th state, "Diane recommends we not remove him from a supervisory role." (Pl.'s Evid. Mat. at Ex. 20, p. UAZ001373.)

inappropriate behavior at CLT. At this meeting, Mr. Crawford relayed his conversation with Ms. Zombo to Mr. Schneider, specifically informing Mr. Schneider that Ms. Zombo felt that Mr. Zakaras should not be removed from his supervisory position. (Schneider's Dep. at 209-10.) In fact, Mr. Schneider's own notes from his September 30th meeting with Mr. Crawford state, "Could be considered one-time event. He admitted being drunk every night. Good evals. Have not had alignment discussion. There has been a drinking problem. Other Chicago O'Hare people drunk. None of these occurred at work." (Schneider's Dep. at 210.) While Mr. Schneider did not have to follow Ms. Zombo's recommendation, Mr. Crawford admitted in his deposition that Mr. Zakaras' case is the only instance he can recall where a manager did not follow Ms. Zombo's recommendation. (Crawford's Dep. at 17-18.) Furthermore, Mr. Schneider admitted that he had been instructed to seek guidance from Human Resources before removing a Ramp Services supervisor from his or her position. (Schneider's Dep at 42-43.) Finally, at this meeting, Mr. Crawford informed Mr. Schneider about Ms. Remer's concerns regarding other O'Hare management personnel being intoxicated at various CLTs. (Pl.'s SMF ¶ 53.)

Mr. Crawford, at Ms. Zombo's request, also instructed Mr. Schneider to obtain a written statement from Mr. Allen, Mr.

Zakaras' CLT Facilitator, about Mr. Zakaras' behavior at the CLT conference. (Schneider's Dep. at 204.) Accordingly, Mr. Schneider spoke to Mr. Allen on the telephone, where Mr. Allen informed Mr. Schneider that Mr. Zakaras had been "cooperative, honest, and supportive" at CLT, and that Mr. Zakaras had retracted some of his disparaging comments about CLT, such as it was a waste of money and a bunch of bull. (Pl.'s SMF ¶ 87; Schneider's Dep. at 206-07.) After receiving this information from Mr. Allen, however, Mr. Schneider did not document it in a written statement, as requested by Ms. Zombo, testifying that after he spoke to Mr. Allen, he "didn't feel Dick Allen and his comments would have a huge bearing on the results of my investigation."[14] (Schneider's Dep. at 208.)

## IV. United's Employee Assistance Program

As a benefit to its employees, United offers an Employee Assistance Program, where employees may meet with a representative to obtain advice about personal problems such as alcoholism. United's EAP is in its Medical Department, and the EAP

---

[14] United vehemently contends that Mr. Crawford did not inform Mr. Schneider that he needed to get a written statement - as opposed to an oral one - from Mr. Allen. (Response to Pl.'s SMF ¶ 87.) However, at Mr. Schneider's deposition, when he was asked, "You understood, though, when Marlon Crawford was telling you to get a statement from Dick Allen, that he meant a written statement, didn't you?", Mr. Schneider responded, "Yes." (Schneider's Dep. at 205.)

Representative has a duty to assess and evaluate employees who come in for personal problems, and to help them decide on a plan for dealing with their problems. (Pl.'s SMF ¶ 28.) According to the EAP's Management Guide, United's EAP is voluntary and an "employee's refusal to use the EAP is not in itself a cause for disciplinary action." (Pl.'s Evid. Mat. at Ex. 2, p. 2.) The Management Guide also states that discipline is not to be used as "retribution for refusal to use the EAP." (*Id.*) Additionally, according to Kenneth Fox, an EAP Representative who saw Mr. Zakaras, an employee has the right for third persons (such as Mr. Schneider) not to know whether the EAP representative has made a formal recommendation for help. (Fox's Dep. at 66-67.) Indeed, communications between an employee and his or her EAP Representative are privileged and confidential, and the EAP representative is not permitted to make recommendations concerning discipline, nor influence the employee's supervisor concerning discipline. (Pl.'s SMF ¶ 31.) As stated in the Management Guide, the EAP and the disciplinary process are separate. (Pl.'s Evid. Mat. at Ex. 2, p. 2.)

According to Mr. Fox, United's managers should refrain from asking an employee if he has a drinking problem, how much he drinks at home, if he is getting "help" for an alcohol problem, or if he

is going to Alcohol Anonymous ("AA") meetings. (Fox's Dep. at 16-17, 101-103.) Furthermore, Mr. Fox testified that it was United's policy in 1996 that an employee could not be terminated for being an alcoholic, or for being regarded as an alcoholic, if he did not have a work performance problem.[15] (Fox.'s Dep. at 104-105.)

Despite United's rules governing its EAP, on September 30, 1996, Mr. Schneider asked Mr. Fox if Mr. Zakaras had been to see him, and Mr. Fox responded that he had, and "not to cut [Mr. Schneider] any deals." (Schneider's Dep. at 199; Pl.'s SMF ¶¶ 38, 129.) Mr. Zakaras maintains that he only authorized Mr. Fox to inform Mr. Schneider that he (Mr. Zakaras) had, in fact, kept his appointment. (Pl.'s SMF ¶ 82.) Furthermore, Mr. Fox told Mr. Crawford to "really stay on top of" Mr. Zakaras, and that he (Mr. Fox) had had a conversation with Mr. Zakaras about "the benefits of getting some formal help." (Crawford's Dep. at 145-46; Pl.'s SMF ¶¶ 38, 126.) While admitting the specific quotes above, United denies that Mr. Fox ever discussed the substance of his communications

---

[15] United contends that Mr. Fox has no role in making discipline decisions, and, therefore, his assertion that employees could not be terminated, based on United's EAP policy, for being an alcoholic is "misleading." (Response to Pl.'s SMF ¶ 34.) The Court is unimpressed with Defendant's argument, and finds that Mr. Fox's understanding of United's EAP policy is relevant, especially considering Mr. Fox is a United EAP Representative that specifically saw Mr. Zakaras.

with Mr. Zakaras to Mr. Schneider or Mr. Crawford. (Response to Pl.'s SMF ¶¶ 83, 126.)

## V. The Demotion

After the September 25th meeting, the next time that Mr. Schneider spoke to Mr. Zakaras about his conduct at the CLT conference was on October 25, 1996. (Pl.'s SMF ¶ 89.) As with the September 25th meeting, Plaintiff and Defendant have different versions of what transpired at the October 25th meeting. According to Mr. Zakaras, Mr. Schneider asked him a series of personal questions about his drinking habits, such as whether he was still going to EAP, what he was doing to "get help" for his "drinking problem," and whether he was "still drinking."[16] (Id.) Mr. Zakaras claims that he answered the question regarding whether he was going to EAP, but informed Mr. Schneider that his questions concerned private matters. (Id.)

At this meeting, Mr. Schneider informed Mr. Zakaras, for the first time, that United found him not guilty of sexual harassment for his conduct at CLT, because the female employees' statements

---

[16]   Mr. Schneider admits that he asked Mr. Zakaras whether he was seeing Mr. Fox at EAP, and whether he was getting help for his drinking problem, but does not remember specifically asking him how much he drank at night in his private time. (Schneider's Dep. at 220-21.)

had indicated that his behavior had not been sexual in nature.[17] (Pl.'s SMF ¶ 91.) Nonetheless, Mr. Schneider informed Mr. Zakaras that he was being removed from his current supervisory job (under Mr. Schneider) because of his unacceptable behavior at CLT, especially for a supervisory employee.[18] (Def.'s SUF ¶¶ 37, 40; Schneider's Aff. ¶¶ 8-9.) While he was found not guilty of sexual harassment, Mr. Schneider concluded that Mr. Zakaras' behavior at CLT was still unacceptable, because of his remarks at the Arbor Bar lounge that, "he didn't want to hear anything Gerald Greenwald had to say," that he worked for United 30 years and "wasn't about to

---

[17]     Mr. Zakaras emphasizes that Mr. Schneider had these statements since the September 25th meeting (when the sexual harassment investigation ostensibly began), but failed to inform Mr. Zakaras, until the October 25th meeting, that these statements had cleared him of sexual harassment. (Pl.'s SMF ¶ 91.)

[18]     Mr. Crawford approved of Mr. Schneider's decision to remove Mr. Zakaras from his management position. (Pl.'s SMF ¶ 120.) Before the decision was made, Mr. Crawford created a "pro" and "con" list concerning whether Mr. Zakaras should be demoted. In the "pro" list he wrote,"intoxicated (3 witnesses)," "statement of innocence (recanted) and followed with 'I don't recall'", "admitted drinking problem," "culturally unaligned," "possible sexual harassment," "smelled of stale alcohol," "admitted to being at mtg. intoxic.," and "no proactive steps to correct problem." In his "con" list, he wrote "one time event ???/ not on the job", "good evaluations/nothing in file," "alignment discussions not held," and "others (mgt) known to be intoxicated." (Pl.'s Evid. Mat at Ex. 21, p. UAZ001608.)

change now,"[19] that he repeatedly asked women if they were happily married, and that he commented to Ms. Burbank about how nice the ass was of one of his female team members at CLT. (Schneider's Aff. ¶ 6.) Mr. Schneider qualified, however, that he would not object to Mr. Zakaras trying to locate another supervisory job in another department at United, but would not personally assist Mr. Zakaras in this effort. (Def.'s SUF ¶¶ 43-44; Schneider's Dep. at 231.)

Mr. Schneider further testified that he had the power to terminate Mr. Zakaras, but instead decided to demote him, because he felt that Mr. Zakaras could still be a productive employee at United, as long as he was not in a supervisory position. (Def.'s SUF ¶ 39; Schneider's Aff. ¶ 12.) In fact, when asked at his deposition why he felt that Mr. Zakaras should not supervise other employees, Mr. Schneider responded, "Because of my belief that he had not adopted Jerry Greenwald's culture and because of the perceived drinking problem that in my belief he was not getting

---

[19]     Mr. Zakaras alleges that it is inconsistent with United's discipline policy to remove an employee from his or her management position for expressing criticism of United's programs. (Pl.'s SMF ¶ 94.)  Indeed, Mr. Schneider admitted in his deposition that he did not believe that it was consistent with United's discipline policy to terminate an employee from a management position for expressing criticism of a United program. (Schneider's Dep. at 39.)

help for."[20] (Schneider's Dep. at 235.) Mr. Schneider states that this belief was based upon Mr. Zakaras having gone to EAP only once or twice, but admits that Mr. Zakaras never told him that he was not "getting help" through some other means in his private time. (Pl.'s SMF ¶ 132.)

There is a disputed issue of material fact concerning when United definitively informed Mr. Zakaras that he was, indeed, demoted. United contends that Mr. Zakaras was specifically informed that he was being demoted at the October 25th meeting, and that he had until November 6th to locate another management position, or he would need to report to Air Freight. Mr. Zakaras insists, however, that he did not know that his demotion was final, because he felt that he could locate another supervisory position within United. (Pl.'s SMF ¶ 102.) Indeed, Mr. Zakaras points to an example where a United employee, who had called another employee a "stupid nigger", was transferred from his management position in Ramp Services to a management position as a Zone Controller, with

---

[20] Interestingly, Mr. Crawford's notes, that he kept in the ordinary course of business, state, "Stay away from the alcohol issue." (Pl.'s Evid. Mat. at Ex. 21, p. UAZ001608.) Mr. Crawford testified that he believed that he wrote this note sometime shortly before the demotion decision was made. (Crawford's Dep. at 75-76.)

no loss in pay.[21] (Pl.'s SMF ¶ 98.)    Consequently, Mr. Zakaras

asserts that he did not know his demotion, especially with its

consequent reduction in pay and responsibility, was definite at the

October 25th meeting.   (Pl.'s Aff. ¶¶ 67-68.)

On November 6, 1996, it is undisputed that Mr. Schneider sent

Mr. Zakaras a letter explaining that he was being demoted for

violating United's rule against "engaging in conduct on or off duty

that is or could be detrimental to the Company or could negatively

affect the Company's relationship with customers, travel agents,

suppliers, employees or the public,"[22] that he was to report to Air

Freight, and that his salary was to be gradually reduced.  (Def.'s

SUF ¶ 45; Pl.'s SMF ¶ 102; Pl.'s Evid. Mat. at Ex. 4.)   Mr. Zakaras

---

[21]      United objects to Mr. Zakaras' use of this example
because, while this fact was included in Plaintiff's Statement of
Material Facts, it was not similarly argued, or even mentioned,
in Plaintiff's Response brief, and is therefore, arguably,
waived.   While Defendant is technically correct (see Rai v.
Dynagear Inc., No. 98-6053, 2000 WL 875401, at *9 (N.D. Ill. June
26, 2000) ("Any argument based on a fact raised in a Rule 12(N)
[now 56.1] statement is waived if it is not asserted in the
brief."), the Court does not wish to penalize Plaintiff for his
lawyer's technical mistake.   Plaintiff's lawyer, however, should
consider herself warned that arguments based on facts contained
in a local rule 56.1 statement should be asserted in a brief, or
they could be waived.

[22]      Mr. Schneider admits that, except in Mr. Zakaras' case,
he does not recall ever personally citing this particular rule,
or know of any other United employee citing this rule, when
disciplining an employee.  (Schneider's Dep. at 54.)

received the letter a couple days later, and insists that this was the first time United notified him of the specific rule that he had allegedly violated, and that he was definitively being demoted. (Pl.'s Affidavit ¶ 68.)

## PROCEDURAL HISTORY

Mr. Zakaras filed a Charge with the Equal Employment Opportunity Commission ("EEOC") on September 2, 1997, alleging sex discrimination, retaliation, age discrimination, and disability discrimination. The EEOC sent Mr. Zakaras his right to sue letter on December 1, 1997. Mr. Zakaras filed his four-count Complaint in federal court on March 3, 1998. Count I alleges *quid pro quo* sexual harassment and retaliation, in violation of Title VII. Count II alleges age discrimination in violation of the ADEA. Count III alleges breach of contract.[23] Finally, Count IV alleges perceived disability discrimination (*e.g.* alcoholism), in violation of the ADA. Defendant filed its Motion for Summary Judgment on all counts of Plaintiff's Complaint on May 30, 2000.

---

[23] The Court has supplemental jurisdiction over the state contract law claims pursuant to 28 U.S.C.A. § 1367.

## DISCUSSION

### I.  Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the evidence of the non-movant must be believed, and all justifiable inferences must be drawn in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The party must do more than simply "show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

trial.' " *Id.*, 475 U.S. at 587. This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II. All of Plaintiff's Statutory Claims are Not Necessarily Time-Barred

Defendant argues that all of Plaintiff's statutory claims (Counts I, II and IV) are time-barred, because Plaintiff's EEOC Charge was untimely filed.[24] In order to maintain a claim under Title VII, the ADEA, or the ADA, a plaintiff must file an EEOC Charge within 300 days of the occurrence which forms the basis of

---

[24] Count I alleges *quid pro quo* sexual harassment, as well as retaliation, under Title VII. As explained *supra*, Plaintiff's *quid pro quo* sexual harassment claim is, indeed, time-barred. However, there is a genuine issue of material fact as to whether his retaliation claim (as well as the ADEA and ADA claims) are, similarly, time-barred.

the complaint.[25] *See* 42 U.S.C. § 2000e-5(e); 29 U.S.C. § 626(d)(2); 42 U.S.C. § 12117(a). "Failure to do so bars litigation over those claims." *Speer v. Rand McNally & Co.*, 123 F.3d 658, 662 (7th Cir. 1997). The Seventh Circuit has established that "[w]hen the discriminatory act occurs, no less than whether a given act was discriminatory, is a question of fact." *Lever v. Northwestern Univ.*, 979 F.2d 552, 553 (7th Cir. 1992). In this case, there is a genuine issue of material fact as to whether Mr. Zakaras' claims were filed within 300 days of the discriminatory act.[26]

---

[25] Plaintiffs in Illinois have 300 days to file a Title VII charge, instead of the usual 180 days, because Illinois is a "deferral" state. *See* 42 U.S.C. § 2000e-5(e).

[26] Plaintiff claims, without citing any legal authority, that Defendant has waived a statute of limitations defense with respect to all claims, except the *quid pro quo* sexual harassment claim, because Defendant only mentioned the sexual harassment claim as being time-barred in its Answer to Complaint. However, as Defendant correctly points out, Defendant did not learn of the potential statute of limitations defense for the remaining claims until after Plaintiff's deposition, and furthermore, Plaintiff has not alleged, or produced any evidence, that he would be prejudiced, in any way, by Defendant's failure to plead this particular affirmative defense in its Answer. "This Court allows affirmative defenses to be introduced in a motion for summary judgment where the plaintiff would not suffer prejudice." *Duncan v. Consolidated Freightways Corp.*, No. 94-2507, 1995 WL 530652, at * 5 (N.D. Ill. Sept. 7, 1995). Moreover, as will be explained *supra*, the Court rejects Defendant's limitations affirmative defense for the retaliation, ADEA and ADA claims, so the issue is moot.

-27-

The "accrual date" of a plaintiff's claim is the date on which the statute of limitations begins to run. *Cado v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). In cases of alleged discriminatory demotion (or termination), the period begins to run on the date the employee is notified that he will be demoted. *See Delaware State College v. Ricks*, 449 U.S. 250, 259 (1980) ("limitations periods commenced to run when the [adverse employment action] was made and [the employee] was notified."); *see also Murrell v. USF & G Ins.*, 81 F. Supp.2d 912, 921 (N.D. Ill. 2000) (holding that accrual date begins to run on the date the employee is "notified unambiguously" of the adverse employment action). The pivotal question, therefore, is when did United unambiguously and definitively inform Mr. Zakaras that he was being demoted.

It is undisputed that Mr. Zakaras did not file his EEOC Charge until September 2, 1997, which is 311 days after October 25, 1996. United argues that Plaintiff's retaliation claim under Title VII, and his discrimination claims under the ADEA and the ADA, are time-barred, because he did not file them within 300 days of the accrual date – the October 25th meeting. While United contends that Mr. Zakaras definitively knew he was being demoted at the October 25th

meeting, Mr. Zakaras maintains that he did not know the demotion was definite until he received a letter from Mr. Schneider dated November 6, 1996.

It is undisputed that, at the October 25th meeting, Mr. Schneider, indeed, informed Mr. Zakaras that he was being removed from his supervisory position in Ramp Services because of his unacceptable conduct at CLT. Mr. Zakaras asked, however, whether he could obtain another supervisory position in another department at United – one where he would not be working directly under Mr. Schneider. Mr Schneider stated that he would not object to Mr. Zakaras obtaining another supervisory position, but would not assist him in locating another position.

The deposition testimony of both Mr. Schneider and Mr. Zakaras reveal that there is a genuine issue of material fact concerning whether Mr. Zakaras unambiguously knew that he was definitely being demoted at the October 25th meeting. At Mr. Schneider's deposition, he was asked, "So on October 25th of '96, Mr. Zakaras did not know one way or another whether he would actually have a management position of some sort at United Airline, correct?" Mr. Schneider answered, "That would be my guess, yes."[27] (Schneider's

---

[27]     Mr. Schneider also testified at his deposition, "I

(continued...)

Dep. at 186.) Furthermore, when Mr. Schneider was asked, "When was it actually decided as to what would happen to Mr. Zakaras at United Airlines in terms of where he would next be, if anywhere? Was he informed of that in the first week of November?" Mr. Schneider responded, "I don't know what date the final day of our job was communicated to him, but it would have been, I believe, the first week of November." (Schneider's Dep. at 182.) However, Mr. Schneider then stated that Mr. Zakaras' "status [with United] was communicated on October 25th." (*Id.*)

At Mr. Zakaras' deposition, he testified about the October 25th meeting as follows: "When I was pleading for my job, I was given an opportunity – I thought that most I would get out of this was a letter of reprimand, not a demotion. And in the course of that he [Mr. Schneider] says – he came out and flat out told me there was nothing to substantiate sexual harassment, but it's about my unacceptable behavior." (Pl.'s Dep. at 172.) While Mr. Zakaras' statement, "I thought that most I would get out of this

---

[27](...continued)
believe what I told him [Mr. Zakaras] on October 25th is that he had a period of time at which time he could look for another job and after a certain point, I forgot the day, if it was 11/3 or I don't know what day, but I did have another job for him as an AFR [Air Freight Representative] that was guaranteed, but he could use this other time to look for a better job if that's what he wanted to do." (Schneider's Dep. at 185-86.)

was a letter of reprimand, not a demotion" illustrates that Mr. Zakaras was aware, at a minimum, of the significant possibility that he was being demoted at the October 25th meeting, there is a question of material fact as to whether the demotion was, indeed, definite at this meeting.[28]

Significantly, both Mr. Schneider and Mr. Zakaras agree that the possibility existed, at the October 25th meeting, that Mr. Zakaras would obtain another supervisory position. In fact, Mr. Zakaras knew of another United employee, who after calling someone a "stupid nigger," was transferred from his supervisory position in Ramp Services to another supervisory position as a Zone Controller with no loss in pay. (Pl.'s SMF ¶ 98.) Consequently, at the October 25th meeting, there remained a possibility that Mr. Zakaras was going to be transferred to another department as a supervisor. The Seventh Circuit has held that transfers, with no loss in pay, are, in some instances, not considered adverse employment actions.

---

[28]    Both parties deem it significant whether Mr. Zakaras was specifically told, at the October 25th meeting, that he would need to report to Air Freight, by some date in November, if he did not locate another supervisory position in the interim. While whether he was, indeed, informed at the October 25th meeting that he needed to report to Air Freight is a fact in dispute, it is not material. The critical fact remains, that at the October 25th meeting, a possibility existed that Mr. Zakaras would not be demoted.

*See, e.g., Williams v. Bristol-Myers Squibb* Co., 85 F.3d 270, 274 (7th Cir. 1996) (holding that transfer involving no reduction in pay, and only a minor change in working conditions, does not rise to the level of a material adverse employment action); *Crady v. Liberty National Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993) (finding that employee did not suffer adverse employment action as a result of a transfer from one management-level position to another management position, with same salary and benefits, even though his responsibilities changed). Arguably, it was not until Mr. Zakaras received Mr. Schneider's letter, dated November 6, 1996, that Mr. Zakaras definitively knew that he was being demoted, as opposed to being transferred.[29] Therefore, there is a genuine issue of material fact as to whether the accrual date

---

[29] United emphasizes that the accrual date begins when the plaintiff is notified of the adverse employment action - not when the *effects* of that action are later felt by the plaintiff, and cites *Librizzi v. Children's Memorial Med. Ctr*, 134 F.3d 1302, 1306 (7th Cir. 1998)(limitations period "begins on the date the employee learns about the adverse decision . . . rather than when the financial consequences of the decision are felt"), along with other cases, for this proposition. While United's statement of the law is correct, there, nonetheless, remains a genuine issue of material fact as to whether Mr. Zakaras definitively knew that he was being demoted (the underlying adverse employment action) - as opposed to being transferred - at the October 25th meeting. Hence, in this case, it is not merely a question of "financial consequences" as Defendant would have the Court believe.

for the demotion should begin on October 25th or after November 6th.[30]    Accordingly, Mr. Zakaras' retaliation claim under Title VII, and discrimination claims under the ADEA and the ADA, are not, necessarily, time-barred, and the issue will go before a trier of fact.

The Court will now substantively address each Count of Plaintiff's Complaint.

## III. Count One: Sexual Harassment and Retaliation

Mr. Zakaras alleges that United's management subjected him to *quid pro quo* sexual harassment, in that he was required, as a condition of his employment, to participate in sexually offensive touching during the "web" and "patio block" exercises at CLT, held from August 19 through August 22, 1996. (Complaint ¶ 54.) As a preliminary matter, Plaintiff's *quid pro quo* sexual harassment claim is time-barred.    The 300 day statute of limitations for filing an EEOC Charge on Mr. Zakaras' *quid pro quo* sexual

---

[30]    Both Defendant and Plaintiff acknowledge that the letter was sent out on November 6th, but that Plaintiff would not have received it until a couple days later.    Therefore, assuming the accrual date is when Mr. Zakaras received the November 6th letter, he would be within the 300 day time limit, and his statutory claims for retaliation, and age and disability discrimination, would not be time-barred. (Even if Plaintiff had received the letter *on* November 6th, he would be just within the 300 day time limit.)

harassment claim began to run no later than August 22, 1996 – the last day of the CLT conference. Yet, Mr. Zakaras filed his EEOC Charge on September 2, 1997 – exactly 376 days after CLT ended. In fact, Plaintiff failed to even address this issue in its Response to Defendant's Summary Judgment Motion ("Response"). Consequently, Plaintiff's *quid pro quo* claim for sexual harassment under Title VII is untimely and must be dismissed. *See Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995) (affirming summary judgment of time-barred sexual harassment claim); *Cross v. Chicago Sch. Reform Bd. of Trustees*, 80 F. Supp.2d 911, 914 (N.D. Ill. 2000) (granting summary judgment because sexual harassment occurred more than 300 days before filing of Charge).

Even if the Court were to substantively address Plaintiff's *quid pro quo* sexual harassment claim, however, it would still be dismissed. *Quid pro quo* harassment occurs "where submission to a supervisor's sexual demands is made a condition of tangible employment benefits." *Harris v. City of Harvey*, 993 F. Supp. 1181, 1185 (N.D. Ill. 1998)(citation omitted). The Seventh Circuit has rejected *quid pro quo* harassment claims where the plaintiff produces no evidence of any sexual demands or advances by his or her supervisor. *See, e.g., Brill v. Lante Corp.*, 119 F.3d 1266,

-34-

1274 (7th Cir. 1997) (affirming summary judgment where supervisor made no sexual advance whatsoever, stating that *quid pro quo* claim was "curious to us."); *Bevilacqua v. Cubby Bear, Ltd.*, No. 98 C 7568, 2000 WL 152135, at *6 (N.D. Ill. Feb. 4, 2000) (granting summary judgment because plaintiff produced no evidence that supervisor requested sexual favors).

In the case *sub judice*, Plaintiff has neither alleged nor produced any evidence that Mr. Schneider, or any other supervisor, made any sexual advances or demanded sexual favors of him. Indeed, Plaintiff's supervisor, Mr. Schneider, did not even attend the CLT conference. Furthermore, there is no evidence that any United supervisor conditioned Mr. Zakaras' employment on acceding to sexual demands. *See Harris*, 993 F. Supp. at 1186 (plaintiff "has not presented any evidence that her supervisors conditioned her employment on submitting to sexual demands."). Moreover, Mr. Zakaras submits no evidence that he was *required* to participate in the "web" or "patio block" exercises at CLT. Indeed, Mr. Zakaras testified that no one ever told him that he would be demoted, terminated, or would otherwise suffer any negative consequences if he declined to participate in the exercises. (Def.'s SUF ¶ 49.) Significantly, Mr. Zakaras never declined, or even offered

resistance, to participating in the exercises. His mere discomfort with the "web" and "patio block" exercises is not *quid pro quo* sexual harassment.[31]

Plaintiff also asserts in Count I that Mr. Schneider demoted him in retaliation for his complaints about the "web" and "patio block" exercises at CLT. Plaintiff, however, cannot establish a *prima facie* case of retaliation. Specifically, Plaintiff must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action subsequent to his protected activity; and (3) that there is a casual link between his participation in the protected activity and the adverse employment action. *Koelsch*, 46 F.3d at 708. Causation is a critical element of the *prima facie* case. *Hamann v. Gates Chevrolet, Inc.*, 910 F.2d 1417, 1420 (7th Cir. 1990). In order to demonstrate causation, Mr. Zakaras must present evidence that United would not have taken the adverse action "but for" his protected activity. *Johnson v. University of Wis.-Eau Claire*, 70 F.3d 469, 479 (7th

---

[31]     Plaintiff has alleged only *quid pro quo* sexual harassment. (Complaint ¶ 54.) As Defendant point outs, even if Plaintiff had alleged that the CLT exercises created a "hostile work environment," such a claim would be dismissed, because Plaintiff's allegations regarding isolated exercises at CLT are not sufficiently "severe or pervasive" to be actionable. *See Koelsch,* 46 F.3d at 708.

-36-

Cir. 1995). Additionally, Mr. Zakaras must show more than a mere temporal proximity between the time of his complaint and the date of his demotion. *Foster v. Arthur Anderson, L.L.P.,* 168 F.3d 1029, 1034 (7th Cir. 1999).

In the case *sub judice*, Mr. Zakaras cannot demonstrate that there is a casual link between his complaining about the exercises at CLT and his demotion.[32] Mr. Zakaras informed Mr. Schneider and Mr. Crawford, at the September 25th meeting, that he felt that the CLT exercises were in violation of United's sexual harassment policy. (Def.'s SUF ¶ 32.) On September 20th, however - five days before Mr. Zakaras complained about the CLT exercises – Mr. Schneider had requested a written statement from Mr. Zakaras concerning his conduct at the Arbor Bar at CLT, and directed Mr. Zakaras to bring that statement to another meeting on September 25th. It was at the September 25th meeting – after the

---

[32]   Defendant also argues, without citing any cases, that Plaintiff cannot show that he engaged in statutorily protected activity when he informed United that he felt the exercises at CLT were inconsistent with United's sexual harassment policy. The Court is not persuaded that, merely because Mr. Zakaras did not specifically mention that the CLT exercises violated Title VII *per se*, or that he was personally harassed, means that he did not engage in statutorily protected activity. Nevertheless, because Plaintiff cannot establish a casual link between such protected activity and his demotion, the Court does not need to determine whether his comments to Mr. Schneider and Mr. Crawford did, indeed, constitute statutorily protected activity.

investigation into Mr. Zakaras' behavior at CLT had *already* begun - that Mr. Zakaras first mentioned his uncomfortableness with the CLT exercises.[33]

United did, clearly, know about Mr. Zakaras' complaints regarding the CLT exercises *before* the demotion decision, however. Yet, the demotion decision followed an investigation into Mr. Zakaras' behavior at CLT - an investigation that commenced at least five days before Mr. Zakaras complained to Mr. Schneider, the decision-maker. It is well-settled that "to demonstrate a 'casual link,' a plaintiff must demonstrate that the employer would not have taken the adverse action 'but for' the protected expression." *Ferguson v. Robert R. McCorkink Tribune Foundation*, 108 F. Supp.2d 1033, 1040 (N.D. Ill. 2000). Here, the most that Mr. Zakaras has shown is that Mr. Schneider knew of Mr. Zakaras' dissatisfaction with the CLT exercises at the time he decided to demote him. However, "knowledge is insufficient to establish a causal link. In

---

[33]     While, in August 1996, Mr. Zakaras had told CLT Facilitators, Mr. Allen and Ms. Martin, that he felt the "web" and "patio block" exercises violated United's sexual harassment policy, Mr. Zakaras submits no evidence that Mr. Allen or Ms. Martin ever relayed Mr. Zakaras' complaints to Mr. Schneider, the decision-maker. Furthermore, Mr. Zakaras cites no evidence that Mr. Allen participated, in any way, in the decision to demote him. Consequently, any comments made to Mr. Allen or Ms. Martin about the exercises are irrelevant when analyzing Plaintiff's retaliation claim.

addition, the mere occurrence of the adverse action after the protected expression is insufficient to support a presumption of causation." *Tutman v. WBBM-TV/CBS, Inc.*, 54 F. Supp.2d 817, 823 (N.D. Ill. 1999)(citations omitted), *aff'd*, 209 F.3d 1044 (7th Cir. 2000). In sum, Mr. Zakaras has submitted no evidence that his complaints about the CLT exercises on September 25th – five days before the investigation commenced – had any bearing whatsoever on the demotion decision, which occurred, at the earliest, on October 25th. Therefore, Mr. Zakaras cannot establish a *prima facie* case of retaliation,[34] and his retaliation claim under Title VII is, accordingly, dismissed.

## IV. Count Two: Age Discrimination

Plaintiff also cannot establish a *prima facie* case of age discrimination under the ADEA. To satisfy the *prima facie* case, Plaintiff must show that, (1) he was a member of the protected class, *i.e.* age 40 or older; (2) he was performing his job to

---

[34] Because Plaintiff cannot establish a *prima facie* case of retaliation, the Court does not need to address whether the demotion decision was pretextual. The Court would like to point out, however, that Mr. Schneider's decision, on September 20th, to undertake an investigation of Mr. Zakaras' conduct at CLT – five days before Mr. Zakaras communicated his discomfort with the CLT exercises – belies any notion that Mr. Schneider was motivated by a retaliatory animus.

United's legitimate expectations; (3) he suffered an adverse employment action, and (4) United treated substantially younger, similarly situated employees more favorably. *Korotko-Hatch v. John G. Shedd Aquarium*, 65 F. Supp.2d 789, 796 (N.D. Ill. 1999). If the plaintiff can establish a *prima facie* case, a rebuttable presumption of discrimination arises and the defendant must present evidence of a legitimate, nondiscriminatory reason for its actions. *Id*. Once the defendant meets this requirement, the *prima facie* case dissolves, and the burden shifts back to the plaintiff to show that the defendant's proffered reasons are really only a pretext for discrimination. *Id*.

In the case *sub judice*, Plaintiff cannot satisfy his *prima facie* case, namely because he cannot establish that United treated a substantially younger, similarly situated employee more favorably.[35] To be "similarly situated," the alleged comparable employees must have held the same or similar employment positions, had similar employment histories, and engaged in similar misconduct giving rise to the employment action. *Mora v. Chicago Tribune*, 57 F. Supp.2d 626, 635 (N.D. Ill. 1999), *aff'd*, 2000 WL 491689 (7th

---

[35]    Mr. Zakaras was 50 years old at the time of his demotion in 1996. Mr. Schneider, the decision-maker, was 47 in 1996. (Def.'s SUF ¶¶ 55-56.)

Cir. 2000); *Simmons v. Sweetheart Holdings, Inc.*, No. 95-C-6548, 1997 WL 428517, at *5 (N.D. Ill. 1997). In *Simmons*, the plaintiff sought to compare the circumstances of his case with two employees who worked in different positions and had different supervisors. The court rejected the plaintiffs' proposed comparisons, and granted summary judgment to the defendant, because the two employees "were not similarly situated to Plaintiff." 1997 WL 428517, at *5. The court in *Simmons* specifically emphasized that treatment of other employees "who had different positions and different supervisors is not relevant to [the] inquiry." *Id.* (citation omitted).

Here, Plaintiff has failed to identify any United employee who was "substantially younger" and similarly situated to himself, but was treated more favorably. Mr. Zakaras only identifies one employee, Mike Jones, who was supervised by Mr. Schneider, and, arguably, received more favorable treatment.[36] (Def.'s SUF ¶ 58.) However, the undisputed evidence shows that Mr. Jones was not similarly situated to Mr. Zakaras. First and foremost, Mr. Jones was 50 years old at the time of his demotion (the same age as Mr.

---

[36] Mr. Zakaras did not identify Mr. Jones in his Response, but merely mentioned Mr. Jones in his deposition as a "possibility" of someone who was similarly situated to himself, but treated more favorably. (Pl.'s Dep. at 36, 39.)

Zakaras), and, therefore, not "substantially younger" as required for liability under the ADEA. (Def.'s SUF ¶ 60.) *See Korotko-Hatch*, 65 F. Supp.2d at 797, n. 8 (finding that term "substantially younger" means at least ten years younger than plaintiff). Second, the conduct which led to Mr. Jones' demotion is not similar, in any way, to Mr. Zakaras' conduct at CLT. Mr. Schneider demoted Mr. Jones for not being able to control his wife's disruptive behavior. (Apparently, his wife was harassing another United employee, and despite warnings from Mr. Schneider, Mr. Jones could not control her.) (Def.'s SUF ¶ 62.) *See Johnson v. National R.R. Passenger Corp.*, 23 F. Supp.2d 909, 913 (N.D. Ill. 1998)(finding plaintiff not similarly situated to employees who had engaged in different conduct). Finally, Mr. Zakaras and Mr. Jones did not hold similar positions before their respective demotions. While Mr. Zakaras had been a Ramp Supervisor, Mr. Jones had been an Operations Manager. (Def.'s SUF ¶ 63.) Consequently, Mr. Zakaras' would-be reliance on Mr. Jones fails to establish the requisite *prima facie* case for age discrimination. Thus, Mr. Zakaras fails to establish his *prima facie* case.

Nonetheless, even if he were to establish a *prima facie* case of age discrimination, Mr. Zakaras cannot establish that his

demotion was pretextual. Indeed, Mr. Zakaras testified that he has never heard Mr. Schneider comment, or engage in any conduct, that would lead him to believe that Mr. Schneider (who himself was 47) would discriminate based on age. (Pl.'s Dep. at 179-180.) *See Richter v. Hook-SuperX, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (affirming summary judgment motion, and noting fact that decision-makers themselves were over age 40). Furthermore, there is no evidence that Mr. Greenwald, who allegedly made the ageist comments, participated, in any way, in the decision to demote Mr. Zakaras. "Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686-87 (7th Cir. 1991)(citation omitted). Finally, most telling is that Mr. Zakaras does not address his inability to establish a *prima facie* case, or that his demotion was a pretext for age discrimination, anywhere in his Response.[37]

---

[37] Plaintiff does, however, attempt to introduce a new argument in his Response - namely, that United *retaliated* against him in violation of the ADEA, because he complained about Mr. Greenwald's alleged ageist remarks. The Court will not consider this claim of retaliation for several reasons. First and foremost, Plaintiff's EEOC Charge did not allege that he was subjected to retaliation for complaining about Mr. Greenwald's supposed ageist remarks. Rather, Plaintiff's Charge only alleged
(continued...)

-43-

Accordingly, Plaintiff's age discrimination claim under the ADEA is dismissed.

## V.  Count Three: Breach of Contract

Plaintiff alleges that Defendant breached a "contract" by violating (1) its sexual harassment policy, and (2) its EAP policy. For the following reasons, the Court dismisses Count III of Plaintiff's Complaint.

---

[37](...continued)
retaliation arising out of his complaints about sexually offensive conduct. Hence, Plaintiff is barred from raising a retaliation claim under the ADEA in this lawsuit. *See, e.g., Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir. 2000) ("As a general rule, any claim that an ADEA plaintiff wishes to pursue in federal court must first be presented to the EEOC."). Second, Plaintiff's Complaint also fails to mention that Mr. Zakaras was subjected to unlawful retaliation under the ADEA. Plaintiff's Complaint solely alleges that Plaintiff was "qualified" for a management position, and that United "terminated" him "because of his age." Where, as here, a plaintiff seeks to add a retaliation claim, for the first time in response to a summary judgment motion, courts have consistently refused to consider such new arguments. *See, e.g., Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (stressing that it "is too late in the day to be adding new claims" in response to a summary judgment motion). Finally, as Defendant points out, Mr. Zakaras never sought to amend either his EEOC Charge or his Complaint, to add an ADEA retaliation claim, at any time during the 31 months since he filed his lawsuit against United. *See Teall v. City of Chicago*, 986 F. Supp. 1098, 1101 (rejecting claim raised in response to summary judgment where plaintiff never sought to amend complaint, and did not raise that claim in EEOC charge or complaint). Consequently, because of this litany of procedural errors, the Court does not need to substantially address whether United, in fact, retaliated against Mr. Zakaras for complaining about Mr. Greenwald's alleged ageist remarks.

Whether a statement in an employment policy constitutes a "contract" is a matter of law. *Barefield v. Village of Winnetka*, 81 F.3d 704, 709 (7th Cir. 1996). To establish that a policy statement constitutes an enforceable contract under Illinois law, a plaintiff must prove: (1) the language of the policy contains a promise clear enough that an employee would reasonably believe that an offer has been made; (2) the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer; and (3) the employee accepted the offer by commencing or continuing to work after learning of the policy. *Duldulao v. St. Mary's of Nazareth Hosp.*, 505 N.E.2d 314, 318 (Ill. 1987). Ordinarily, the courts have found that references to general company policies or practices are too indefinite to constitute a promise. *Vickers v. Abbott Lab.*, 719 N.E.2d 1101, 1113-14 (Ill. App. Ct. 1999)(affirming summary judgment because defendant's policies only set forth general guidelines – not any contractual rights).

First, with respect to United's sexual harassment policy, Plaintiff has failed to establish that it is a contract under Illinois law. United's sexual harassment policy is contained in its "Series 15" Regulations, which contain an explicit disclaimer:

"These Regulations do not constitute an employment contract between United Airlines, Inc. and its employees, either by itself or in conjunction with any other material which may have been or may be distributed to employees and are subject to unilateral change by the Company." (Def.'s SUF ¶¶ 73-74.) Indeed, courts have routinely granted summary judgment motions under Illinois law where the defendant's employment manual contains such a disclaimer. *See, e.g., Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 873 (7th Cir. 1989)(finding that disclaimer in manual refutes any contractual intent); *Hanna v. Marshall Field & Co.*, 665 N.E.2d 343, 348 (Ill. App. Ct. 1996)(finding that handbook disclaimers "negate contract formation under *Duldulao*").

Additionally, Mr. Zakaras cannot satisfy the first two prongs of *Duldulao* for establishing a contract. First, nothing in United's sexual harassment policy contains any mandatory language which would constitute a promise.[38] *See Svigos v. Petry Television,*

_____

[38] United's sexual harassment policy, in its Series 15 Regulations, states, "In keeping with our corporate values and our commitment to equal employment opportunity, it is Company policy to forbid harassment and discrimination based on race, color, sex, age, religion, national origin, disability, veteran status, or sexual orientation. The Company believes that each employee should be treated with respect and dignity, in accordance with our corporate values. Harassment and

(continued...)

-46-

*Inc.* No. 95 C 5899, 1996 WL 388416, at * 3 (N.D. Ill. July 9, 1996) (finding that sexual harassment policy was not a contract partly because, there was no clear promise, stating that the policy merely "summarize[d] the existing state of the law" and did "not create any duty separate from those already imposed on the employer by statute). Second, United employees do not receive copies of the Series 15 Regulations, but rather, only have access to review the provisions therein. (Def.'s SUF ¶¶ 75-76.) *See Koch v. Illinois PowerCo.*, 529 N.E.2d 281, 287 (Ill. App. Ct. 1998)(finding that guidelines distributed only to supervisors and management, rather than all employees, insufficiently disseminated to establish a contract under *Duldulao*). Accordingly, Plaintiff cannot establish that United's sexual harassment policy is a contract under Illinois law.

Finally, many courts have specifically held that an employer's sexual harassment policy does not create a binding agreement between an employer and an employee. *See, e.g., Russo v. Nike,*

---

[38](...continued)
discrimination – whether verbal, physical, or visual – violate both Company policy and the law." (Def.'s Appendix in Support of Motion for Summary Judgment at Ex. C.) Significantly, Plaintiff fails to cite the specific language in the sexual harassment policy that would create the required "promise" under *Duldulao*.

*Inc.*, No. 99 C 2726, 2000 WL 347777, at *5 (N.D. Ill. March 28, 2000)(finding sexual harassment policy not an enforceable contract under Illinois law); *Finnane v. Pentel of Am., Ltd.*, 43 F.Supp.2d 891, 900-01 (N.D. Ill. 1999)(finding sexual harassment policy to lack sufficient consideration to be a contract under Illinois law, because alleged "contract" imposes no duties on employer beyond those required by law). Significantly, Plaintiff's Response does not address Defendant's arguments that United's sexual harassment policy is not a contract under Illinois law, but instead, merely asserts that United violated its sexual harassment policy.[39]

---

[39] In Plaintiff's Response, Plaintiff argues that United violated its 1980 Affirmative Action Plan ("AAP") (Pl.'s SMF ¶¶ 17-23)and the 1995 Equal Employment Opportunity ("EEO") Policy (Pl.'s SMF ¶¶ 24-26), in addition to its EAP, when it demoted Mr. Zakaras. (Plaintiff's Response, curiously, fails to even mention the sexual harassment policy described in its Complaint.) In Plaintiff's Complaint, however, Plaintiff alleges that United breached *only* its sexual harassment and EAP policy - not its AAP or EEO Policy. (Plaintiff's Complaint ¶¶ 113-116.) As with Plaintiff's ADEA retaliation claim discussed *infra*, Plaintiff never amended its Complaint, nor sought leave to amend its Complaint, to include these other contracts, and cannot merely add them in its Response. *See, e.g., Teall,* 986 F. Supp. at 1101 ("It is well settled in the Seventh Circuit that a plaintiff cannot amend his complaint with a later filed brief."). Furthermore, Plaintiff did not mention either the AAP or the EEO Policy in his response to United's specific, detailed interrogatory asking for each "contract" that allegedly was breached by United. (*See* United's Reply at Exhibit 2, Answer to Interrogatory # 5.) Plaintiff also never supplemented that discovery response to add the AAP or EEO Policy as a basis for

(continued...)

Because the Court finds that, as a matter of law, United's sexual harassment policy is not a binding contract, it does not need to address whether United, in fact, breached any promises contained in its sexual harassment policy.

Likewise, United's EAP policy is not an enforceable contract under Illinois law. Courts have routinely rejected claims that an employer's EAP, or other drug and alcohol treatment policies, constitute a contract. *See, e.g., Quigley v. Austeel Lemont Co., Inc.*, 79 F. Supp.2d 941, 948 (N.D. Ill. 2000)(finding employer's drug and alcohol policy not an employment contact under Illinois law, because it "does not guarantee or offer [plaintiff] continued employment and cannot be construed as establishing any contractual rights"); *Sears v. Amoco Prod. Co.*, 967 F. Supp. 1222, 1229 (D. Wyo. 1997) (rejecting claim that Amoco's EAP was a contract). Indeed, Plaintiff fails to cite a *single* case in his Response which

[39](...continued)
his contract claim. Consequently, because of these formidable procedural defects, the Court will not substantively address whether the AAP or EEO Policy are, indeed, enforceable contracts under Illinois law. *See Callahan v. City of Rockford*, No. 90-20090, 1994 WL 92391, n. 3. (N.D. Ill.)(rejecting plaintiff's proposed "eleventh hour" addition of two new theories in response to defendant's summary judgment motion, because those theories were not alleged in the complaint and "there has been extensive discover and never so much as a hint of the claim"), *aff'd*, 41 F.3d 1570 (7th Cir. 1994).

holds that an EAP is an enforceable contract, and also fails to contest any of United's arguments that its EAP does meet the requirements under *Duldulao*. Instead, Plaintiff merely argues that Defendant breached the confidentiality, as well as other provisions, of its EAP. While United may have, indeed, violated the procedures of its EAP (discussed *supra*), the EAP is not an enforceable contract, and accordingly, Plaintiff's breach of contract claim is dismissed.

## VI. Count Four: Perceived Disability Discrimination

Plaintiff's final, and only viable, claim is that United demoted him because of his perceived disability of alcoholism, in violation of the ADA. As will be discussed, the Court finds that there are genuine issues of material fact as to whether Mr. Schneider demoted Mr. Zakaras because of his perceived disability of alcoholism, in which Mr. Schneider assumed that Mr. Zakaras was not seeking satisfactory professional help for his "drinking problem", even though there is no evidence that Mr. Zakaras' work performance was adversely affected by alcohol, or that he was ever intoxicated during working hours.

To establish a *prima facie* case under the ADA, Mr. Zakaras must show: (1) he is "disabled" as defined by the ADA; (2) his

work performance met the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for the adverse action. *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Once the plaintiff establishes, by a preponderance of the evidence, the *prima facie* case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). In order to stave off summary judgment, the plaintiff must show that the defendant's articulated reason is phony ("pretextual"). *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178-79 (7th Cir. 1997); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2102 (2000)("a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.") In the case *sub judice*, the Court finds that there are genuine issues of material fact as to whether Mr. Zakaras has met his *prima facie* case, and whether United's articulated reasons for the demotion are pretextual.

First, with respect to the *prima facie* case, Mr. Zakaras has submitted evidence from which a rational jury could conclude that United regarded him as disabled.[40]  A plaintiff is "regarded as" disabled if the defendant perceives the plaintiff as being "unable to work in a particular class of jobs" or in a broad range of jobs.[41]  *Sinkler v. Midwest Property Management*, 209 F.3d 678, 686 (7th Cir. 2000).  Defendant argues that Mr. Schneider never told Mr. Zakaras that he was incapable of working in any category of jobs, and, therefore, never regarded him as disabled.  Rather, United asserts that Mr. Schneider informed Mr. Zakaras on October 25, 1996 that he no longer could work as a Supervisor in Ramp Services, but that Mr. Zakaras was free to seek another management position at United, although Mr. Schneider would not assist him in locating another position.  United further argues that Mr. Schneider could have terminated Mr. Zakaras, but instead chose to

---

[40]  Mr. Zakaras does not allege that he has an *actual* disability under the ADA.  Rather, he alleges that United improperly perceived him as having the disability of alcoholism. (Complaint ¶ 43.)

[41]  The "regarded as" prong of the ADA protects an employee in instances where his employer has the misperception either that the employee has a substantially limiting impairment that he does not have, or that an employee has a substantially limiting impairment, when, in fact, the impairment is not so limiting.  *Kroca v. City of Chicago*, 203 F.3d 507, 514 (7th Cir. 2000).

demote him to Air Freight, because Mr. Schneider felt that Mr. Zakaras could still be a productive employee at United. Hence, according to United, Mr. Schneider thought that Mr. Zakaras could, indeed, perform a broad range of jobs - just not one particular job as a Ramp Supervisor under Mr. Schneider.

Nevertheless, there is evidence that Mr. Schneider felt that Mr. Zakaras could no longer supervise employees anywhere, because of his drinking problem. Mr. Schneider testified at his deposition that he told Mr. Zakaras that he would not object to Mr. Zakaras having another management job, so long as the job did not involve supervising employees.[42] Furthermore, during Mr. Schneider's deposition, he was asked, "Why was it that you did not feel that Mr. Zakaras should perform a management job in which he directly supervised other employees?" Mr. Schneider responded, "Because of my belief that he had not adopted Jerry Greenwald's culture and because of the perceived drinking problem that in my belief he was not getting help for." (Schneider's Dep. at 235.)

Although Defendant cites a myriad of cases for the proposition that an employee is not "regarded as" disabled if he can perform a

---

[42]    Mr. Schneider specifically testified at his deposition: "I told him [Mr. Zakaras] that I would endorse him having a management job where he didn't directly supervise employees of which there are many." Schneider's Dep. at 231.

broad range of jobs, in the case *sub judice*, the Court finds that there is evidence that Mr. Schneider thought Mr. Zakaras could *not*, in fact, perform a broad range of jobs. Specifically, Mr. Schneider thought that Mr. Zakaras could not supervise other employees. In *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294 (4th Cir. 1998), the Fourth Circuit held that an employee was "regarded as" disabled when his employer demoted, and eventually terminated him, from his position as a night maintenance supervisor following surgery to remove a brain tumor. Significantly, the court concluded that the employer regarded the employee "as being substantially limited in his ability to perform a *class of supervisory jobs.*" *Cline*, 144 F.3d at 304 (emphasis added). The court further noted that the employee's field of work was "maintenance supervisory work" and not "maintenance work in general." *Id.* at 303. Here, as in *Cline*, there is evidence that Mr. Schneider thought Mr. Zakaras could not supervise other employees because of his perceived disability of alcoholism.

United repeatedly argues that Mr. Schneider only thought that Mr. Zakaras had a drinking problem, because Mr. Zakaras admitted he had a drinking problem in his second written statement. This argument is a red herring, however. It is undisputed that Mr.

Zakaras' work performance never had been adversely affected by alcohol, and that he never had been found intoxicated during working hours. In his second written statement, Mr. Zakaras admitted that he drank a lot in his private hours due to the stress of an ongoing divorce. Mr. Zakaras never admitted that he was an alcoholic, or that he could not satisfactorily perform his current position as a Ramp Supervisor. Mr. Schneider assumed, as he stated in his deposition, that Mr. Zakaras was not seeking help for his drinking problem, and that this was one of the reasons he demoted Mr. Zakaras.[43] (Schneider's Dep. at 219, 235.) Yet, Mr. Schneider admitted that he did not know, in fact, whether Mr. Zakaras was seeking treatment in his private time – just that Mr. Zakaras was not, in his opinion, adequately using United's EAP. (Schneider's Dep. at 236.) As the EEOC Regulations and Interpretive Guidance make clear, even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence of an individual's impairment, can be sufficient to

---

[43]     Mr. Schneider specifically testified: "It was my belief that he [Mr. Zakaras] was not going to change. I didn't have evidence that he went to the EAP program more than once." (Schneider's Dep. at 219.) When asked whether he asked Mr. Zakaras how many times he went to EAP, Mr. Schneider responded, "I believe I did. I don't recall specifically, but I believe I did because it was my understanding that he was not attempting to get help." (Id.)

satisfy the statutory definition of a perceived disability. *Deane v. Pocono Medical Center*, 142 F.3d 138, 144 (3rd Cir. 1998)(*citing* 29 C.F.R. pt. 1630, app. § 1630.2(1)). Accordingly, the Court finds that there is evidence, from which a rational jury could conclude, that Mr. Schneider regarded Mr. Zakaras as an alcoholic who could not perform a broad class of supervisory jobs, and therefore, the first prong of the *prima facie* case under the ADA is satisfied.[44]

There is also evidence that the fourth prong of the *prima facie* case, whether the defendant, more likely than not, unlawfully discriminated against the plaintiff because of his disability, has been met. Because this fourth prong merges with the question of pretext, the Court will consider them together.

United contends that it demoted Mr. Zakaras because of his unacceptable behavior at the CLT conference, which was in violation of United's rule against, "engaging in conduct on or off duty that is or could be detrimental to the Company or could negatively affect the Company's relationship with customers, travel agents,

---

[44]     United does not dispute that the second and third factors of the *prima facie* case are met. Mr. Zakaras was, indeed, legitimately meeting his employer's expectations. At all times, Mr. Zakaras' work performance was rated as good or acceptable, and he never received any discipline before the present controversy. Additionally, there is no dispute that Mr. Zakaras received an adverse employment action - his demotion.

suppliers, employees or the public." Specifically, United asserts

that Mr. Zakaras made inappropriate comments to female employees at

the Arbor Bar, was intoxicated during the CLT conference,[45] and

publically disavowed Mr. Greenwald's comments. Nonetheless, when

the record is examined in the light most favorable to the

plaintiff, there is evidence from which a rational jury could

conclude that Mr. Zakaras' behavior at CLT was not the real reason

for his demotion, and that his demotion was more likely than not a

pretext for perceived disability discrimination. As explained in

*Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir.

1999)(citation and internal quotes omitted):

> [A] plaintiff may [establish pretext] with evidence
> tending to prove that the employer's proffered reasons
> are factually baseless, were not the actual motivation
> for the discharge in question, or were insufficient to
> motivate the discharge. These formulations are simply

---

[45] There is a genuine issue of material fact as to whether
Mr. Zakaras' intoxication occurred on his own time. While United
contends that Ms. Martin had told United employees, on the first
day of the CLT program, that they were on company business and to
act accordingly (Martin's Dep. at 77.), there is evidence that
Ms. Zombo, Mr. Crawford, and indeed, Mr. Schneider, viewed Mr.
Zakaras' intoxication as on his own time. For instance, Mr.
Schneider's notes (which he says simply relay Ms. Zombo's
concerns) indicate that Mr. Zakaras' intoxication and behavior
did not occur at work. The notes specifically say, *inter alia*,
"None of these occurred at work." (Schneider's Dep. at 210.) In
addition, Mr. Crawford's "pro/con list" states as a con: "one
time event ???/ not on the job." (Pl.'s Evid. Mat. at Ex. 21, p.
UAZ001608.)

different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation.

First, there is evidence that Mr. Zakaras' statements to United's female employees at the Arbor Bar were not the real reason for his demotion. United investigated Mr. Zakaras' behavior towards these women at the Arbor Bar, and found his behavior not to be sexual harassment. Ms. McNeil wrote that she had not felt threatened by Mr. Zakaras' behavior; Ms. Boquist wrote that the touching of her leg should be attributed to a "drunken movement" and not a sexual advance; and Ms. Burbank wrote that it was difficult to even hear what Mr. Zakaras was saying because of the noise and music in the bar. Mr. Schneider even testified that he had no reason to disbelieve the women's statements.

Second, there is evidence that Mr. Zakaras' intoxication at CLT was not the real motivation for his demotion. As pointed out by Ms. Martin and Ms. Remer, many United management employees became intoxicated at CLTs – yet, United continued to serve alcohol. In fact, in Ms. Remer's affidavit, she discusses a female Ramp Supervisor from O'Hare who had become so intoxicated at a CLT that she fell down drunk in public at the hotel, but, yet, United continued to serve alcohol, despite her recommendation that it

cease this practice. (Pl.' Evid. Mat. at Ex. 8, ¶¶ 9-11.) While United argues that other management employees who became inebriated at CLT did not, also, publically criticize Mr. Greenwald, thereby distinguishing Mr. Zakaras' case, there still remains genuine issues of material fact as to whether Mr. Zakaras' intoxication and disparaging comments about Mr. Greenwald were the true reasons for his demotion.

Significantly, Ms. Zombo, Director of Human Resources, recognized the inconsistencies and problems with demoting Mr. Zakaras for his behavior at CLT. Consequently, she recommended that Mr. Zakaras not be demoted, but instead receive a stern warning. Her specific concerns were that Mr. Zakaras' behavior could be considered a one-time event, other management at CLT had been intoxicated, Mr. Zakaras had good evaluations, his behavior was during non-work time, and an "alignment" discussion had not been held with him. Mr. Crawford relayed these concerns to Mr. Schneider, who dismissed them. While Mr. Schneider did not have to follow Ms. Zombo's recommendations, Mr. Crawford testified that he could not remember an instance when a supervisor did not follow Ms. Zombo's recommendation.

Third, a jury could conclude that Mr. Zakaras was not really demoted because of his criticism of CLT and Mr. Greenwald's

comments. Although Ms. Zombo had recommended that Mr. Schneider obtain a written statement from Mr. Allen, Mr. Zakaras' CLT Facilitator, about Mr. Zakaras' behavior at CLT, Mr. Schneider merely called Mr. Allen, and did not record the conversation in a written statement.[46] Because Mr. Allen had said that Mr. Zakaras had been "cooperative, honest, and supportive" at CLT, and that he had retracted some of his disparaging comments about CLT, (see Schneider's Dep. at 206-07), a trier of fact could conclude that Mr. Zakaras' behavior at CLT was not the real impetus behind his demotion, especially because Mr. Schneider, intentionally, did not record Mr. Allen's favorable statements about Mr. Zakaras in a written statement.

Along these same lines, Mr. Schneider admitted in his deposition that it is inconsistent with United's discipline policy to terminate an employee from management for expressing criticism of United programs (Schneider's Dep. at 39.), and, as pointed out by Ms. Zombo, an "alignment" discussion, where United would attempt to help an employee become aligned with its corporate culture and

---

[46]     United contends that Mr. Schneider did not know he needed to obtain a "written" statement. Because there is evidence, namely Mr. Schneider's deposition testimony, that he, in fact, did know he needed to obtain a written statement, this is a question of fact for the jury.

-60-

philosophy (presumably, before disciplining the employee), had not been had with Mr. Zakaras before the demotion. While, as United argues, an employer's overly harsh disciplinary treatment of an employee is not unlawful discrimination, a trier of fact could conclude that Mr. Schneider's excessive punishment was motivated – not by any inappropriate conduct at CLT – but rather because Mr. Zakaras refused to adequately utilize United's EAP procedures for his "drinking problem."[47] Indeed, at least one court in the Seventh Circuit has viewed an excessive punishment as evidence of pretext. *See Stalter, supra*, 195 F.3d at 290 (finding that "grossly excessive" punishment for alleged infraction "cast[s] doubt on [employer's] true motive.").

Furthermore, there is a serious question as to whether Mr. Schneider and Mr. Crawford violated United's EAP policy. While the EAP policy is not an enforceable contract, United's violation of

---

[47]     United vehemently argues that there is no evidence that Mr. Schneider did not "honestly believe" that Mr. Zakaras had engaged in unacceptable conduct at CLT. The Court disagrees, and believes that there is an issue of material fact concerning the genuineness of Mr. Schneider's motives. As discussed *supra*, there is evidence that Mr. Schneider demoted Mr. Zakaras because he would not get help for his "drinking problem" – not because of his behavior at CLT. For instance, at one point in his deposition, Mr. Schneider testified, "It was my belief that he [Mr. Zakaras] was not going to change. I didn't have evidence that he went to EAP more than once." (Schneider's Dep. at 219.)

its policy may be considered by a trier of fact as evidence of a discriminatory animus. Mr. Schneider admittedly asked Mr. Fox whether Mr. Zakaras had been to see him, and Mr. Fox responded that he had, and "not to cut [Ray] any deals." (Schneider's Dep. at 199.) Furthermore, Mr. Fox told Mr. Crawford to "really stay on top of" Mr. Zakaras, and that he (Mr. Fox) had had a conversation with Mr. Zakaras about "the benefits of getting some formal help." (Crawford's Dep. at 145-46.) United's EAP clearly states that an employee's conversation with an EAP Representative is confidential, and that discipline is an entirely separate matter that should be based on an employee's work performance. Mr. Fox testified that an EAP Representative's recommendation for an employee to receive "formal help" is confidential under the EAP program (Fox's Dep. at 67), and that supervisors are not supposed to ask employees about their private drinking habits during non-working hours. While United contends that Mr. Fox did not share the substance of any communications with Mr. Zakaras to Mr. Schneider or Mr. Crawford, and that Mr. Schneider did not ask inappropriate questions, a trier of fact could conclude that Mr. Schneider did, indeed, violate United's EAP and ask inappropriate questions.

According to Mr. Zakaras, at the October 25th meeting (as well as at the September 25th meeting), Mr. Schneider asked him a series

of personal questions about his drinking habits, such as whether he was still going to EAP, what he was doing to "get help" for his "drinking problem," and whether he was "still drinking." (Pl.'s SMF ¶ 89.) Indeed, Mr. Schneider admits that he asked Mr. Zakaras whether he was seeing Mr. Fox at EAP, and whether he was getting help for his drinking problem, although he does not remember specifically asking him how much he drank at night in his private time. (Schneider's Dep. at 220-21.) Also telling, almost foreshadowing, are Mr. Crawford's notes which say, "Stay away from alcohol issue." Considering that Mr. Zakaras had *never* been found to be intoxicated at work during his thirty-six years as an employee with United, a trier of fact could conclude that Mr. Schneider's questions were in violation of United's company policy, and indicate a discriminatory animus.

In fact, one of the most damaging pieces of evidence illustrating perceived disability discrimination comes from Mr. Schneider's deposition testimony, where he essentially admits that he demoted Mr. Zakaras for not seeking help for his drinking problem. When asked at his deposition why he felt that Mr. Zakaras should not supervise other employees, Mr. Schneider responded, "Because of my belief that he had not adopted Jerry Greenwald's culture and because of the perceived drinking problem that in my

belief he was not getting help for." (Schneider's Dep. at 235.) Mr. Schneider clarified that this belief was based upon Mr. Zakaras having gone to EAP only once or twice, but further conceded that Mr. Zakaras never told him that he was not "getting help" through some other means in his private time. (Schneider's Dep. at 236.) Yet, United's EAP Management Guide clearly states that an "employee's refusal to use the EAP is not in itself a cause for disciplinary action," and that discipline is not to be used as "retribution for refusal to use the EAP." Because there is evidence that Mr. Schneider demoted Mr. Zakaras because he felt that Mr. Zakaras was not sufficiently utilizing United's EAP (even though there had been no evidence of work performance problems), a trier of fact could deduce a discriminatory animus, especially considering that Mr. Schneider's conduct was, likely, in violation of United's EAP policy. Consequently, a rational jury could assess and weigh the evidence, and conclude that Mr. Zakaras' conduct at CLT was not the real reason for the demotion, but rather Mr. Schneider's frustration that Mr. Zakaras was not seeking treatment for his perceived disability of alcoholism.

In sum, there are genuine issues of material fact lurking behind the real reason behind Mr. Zakaras' demotion. Because it is not the province of the Court to resolve factual disputes, or weigh

the evidence, Defendant's Summary Judgment Motion on Count IV, perceived disability discrimination in violation of the ADA, is, hereby, denied.

## CONCLUSION

For the foregoing reasons, the Court finds that there are genuine issues of material fact in dispute regarding when Mr. Zakaras definitely knew that he was being demoted, and whether he was, indeed, demoted for his unacceptable conduct at CLT, rather than for his perceived disability of alcoholism. Accordingly, Defendant's Motion for Summary Judgment with respect to Count IV, the ADA claim, is denied. The Court finds, however, that Mr. Zakaras' claims for *quid pro quo* sexual harassment, retaliation, age discrimination and breach of contract (Counts I, II and III, respectively) are dismissed as a matter of law.

**IT IS THEREFORE ORDERED** that:

Defendant's Motion for Summary Judgment be, and the same hereby is, **GRANTED IN PART.**

November 9, 2000                    ENTER:

ARLANDER KEYS
United States Magistrate Judge

-65-